**Seymour M. CHASE, Plaintiff,**

v.

**PAN–PACIFIC BROADCASTING, INC., et al., Defendants.**

**Civ. A. No. 83–1786.**

United States District Court, District of Columbia.

Sept. 12, 1985.

Charles T. Duncan, Washington, D.C., for plaintiff.

James C. Eastman, Washington, D.C., for defendants.

## MEMORANDUM

### I. *Preliminary Statement*

#### A. *Factual Background*[1]

About June 25, 1980, Masataka Iwasaki, a California resident and Japanese citizen, telephoned Seymour Chase at his District of Columbia office. Mr. Chase is a member of the District of Columbia Bar whose

---

1. The party seeking to invoke federal jurisdiction has the burden of establishing that it exists. *Mitchell Energy Corp. v. Mary Helen Coal Co., Inc.,* 524 F.Supp. 558 (D.D.C.1981). However, if a plaintiff's proof is limited to written materials, the plaintiff need only make a *prima facie* showing of jurisdictional facts to prevail. *Id.; Data Disc, Inc. v. Systems Technology Assoc.,* 557 F.2d

1280, 1285 (9th Cir.1977). "[O]therwise a defendant could obtain a dismissal simply by controverting the facts established by plaintiff through affidavits." *Mitchell Energy Corp. v. Mary Helen Coal Co., Inc.,* 524 F.Supp. at 561. If the plaintiff does present a case for *prima facie* jurisdiction, the court will postpone the

legal practice is devoted principally to communication law.[2] Chase–1 ¶¶ 2, 3, 4.[3] Iwasaki's initial telephone conversation with Chase concerned the possible purchase of a television station in California. The parties agreed to see each other the next weekend, after reaching an agreement on the payment of Chase's fees and expenses. *Id.* Iwasaki and Dennis Kinoshita, an associate of Iwasaki, met with Chase in Los Angeles on the July 4th weekend. Iwasaki ¶ 3; Kinoshita ¶ 4. Chase discouraged the purchase of a local television station, but he did point out that the Federal Communications Commission (FCC) would allocate a license for a television channel in Riverside, California. Accordingly, Chase suggested that Iwasaki apply for that license. Iwasaki ¶ 3.

During the meeting, Iwasaki gave Chase a letter dated July 4, 1980 which Iwasaki had signed as president of Yomiuri World Television Inc. Chase–1 ¶ 5; Complaint (filed June 1, 1983). In the first paragraph of the letter, Iwasaki wrote:

> This [letter] will authorize you to act for me, for any associates I assemble, and for any partnerships or corporations I cause to be formed, in the preparation, filing, and prosecution of applications to the Federal Communications Commission for a construction permit for a new commercial television station and a subscription television system to serve the Los Angeles area.

Iwasaki's letter also outlined the understood fees for Chase's legal services and noted that Iwasaki was providing Chase with a retainer. Chase–1 ¶ 5.

From August 9 to August 11, 1980, Chase met Iwasaki and Kinoshita in Los Angeles and advised them that FCC alien ownership rules prevented Iwasaki from directly owning a television station.[4] Kino-

---

actual trial of the jurisdictional facts until the trial on the merits. *See* R. Casad, Jurisdiction in Civil Actions ¶ 6.01[3][b] (1983) ("The actual trial of the jurisdictional facts ... will be postponed until the trial on the merits.") [hereinafter cited as Civil Actions].

Both the plaintiff Chase and the defendants have submitted affidavits and depositions to support their different versions of the facts. *See, e.g.,* Affidavit of Seymour Chase (filed Aug. 22, 1983); Affidavit of Seymour Chase (filed Apr. 22, 1985); Affidavit of Charles R. Olson (filed Aug. 10, 1983); Affidavit of Mataska Iwasaki (filed Aug. 10, 1983); Affidavit of Dennis K. Kinoshita (filed Aug. 10, 1983); Deposition of Mataska Iwasaki (filed Apr. 16, 1985). As noted above, Chase need only make a *prima facie* showing of jurisdiction as to each defendant to defeat the defendants' motion to dismiss. Accordingly, for purposes of this opinion, we resolve any reasonable factual disputes within the affidavits and deposition in Chase's favor.

2. Charles Olson, who had had a background in broadcasting, referred Iwasaki to Chase. Olson ¶ 2, Iwasaki ¶ 2; Chase-1 ¶ 3.

3. We identify the supporting affidavits by the last name of the affiant and the relevant paragraph number. Since Chase filed two affidavits, we refer to the one filed on August 22, 1983 as "Chase-1" and the one filed on April 22, 1985 as "Chase-2."

4. Although Chase was not specific, we assume that he was referring to alien ownership rules similar to those in 47 C.F.R. § 21.4 (1983):

§ 21.4 Eligibility for station license.

A station license may not be granted to or held by:

(a) Any alien or the representative of any alien.

(b) Any foreign government or the representative thereof.

(c) Any corporation organized under the laws of any foreign government.

(d) Any corporation of which any officer or director is an alien.

(e) Any corporation of which more than one-fifth of the capital stock is owned of record or voted by: aliens or their representatives; a foreign government or representatives thereof; or any corporation organized under the laws of a foreign country.

(f) Any corporation directly or in directly controlled by any other corporation of which any officer or more than one-fourth of the directors are aliens. If the Commission finds that the public interest will be served by the refusal or revocation of such license.

(g) Any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens or their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign government, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

shita ¶ 5. He recommended however that two corporations be formed to circumvent this problem. Iwasaki ¶ 4; Kinoshita ¶ 5. Accordingly, defendant Pan-Pacific was incorporated in California for the purpose of filing before the FCC an application for a broadcast license. Defendant Miko was organized in California solely to own 80 percent of Pan-Pacific stock. Kinoshita, exhibit, ¶ 5.

Iwasaki owned the remaining 20 percent of Pan-Pacific stock. Kinoshita, exhibit. Charles M. Olson was president of the company,[5] and Kinoshita was the accountant and corporate secretary. Olson ¶ 3; Answers of Defendant to Plaintiff's Interrogatories No. 2. Both Olson and Kinoshita were Pan-Pacific directors. Kinoshita ¶ 8; Olson ¶ 3.

Miko had three individual stockholders. Both Kinoshita and Olson each held 37½ shares, while Iwasaki owned the remaining 25 shares.[6] Kinoshita ¶ 8, exhibit; Olson ¶ 4. Originally, Iwasaki had an option to purchase 32½ shares from both Olson and Kinoshita as soon as Iwasaki became an American citizen. Kinoshita ¶ 8; Olson ¶ 4. But, due to claims of excessive control from competing applicants before the FCC, the parties modified the stock option in April 1982, disallowing Iwasaki from exercising his option until the proposed television station had been in operation for three years. Plaintiff's Brief on the Jurisdictional Issue at 19 (filed Apr. 22, 1985).

Kinoshita was the president and accountant of Miko, and Olson was the treasurer. Kinoshita, exhibit; Olson, exhibit A. Both men were directors of the corporation. Kinoshita ¶ 8; Olson ¶ 3. Originally Iwasaki was a director for Miko, but, again due to the challenges of excessive control, Iwasaki gave up his director's position and pledged to refrain from proposing the election of any officer or director until after he had become a citizen. Neither Olson nor Kinoshita invested any money in Pan-Pacific or Miko. Chase-2 ¶ 7. Instead, Iwasaki provided all financing for the companies, either directly or through loans. *See id.* All business for both corporations was conducted through Iwasaki's own business office. *Id.* Iwasaki made all the business decisions with respect to the preparation and prosecution of the license application, assuming all financial responsibility for obtaining the license. Chase-2 ¶ 8.

Several meetings followed which took place outside the District of Columbia. Iwasaki met with Chase in Aspen, Colorado on December 12–14, 1980. Iwasaki ¶ 5. Between March 6–8, 1981, Kinoshita and Iwasaki met Chase in Los Angeles to discuss the FCC license application. Iwasaki ¶ 6; Kinoshita ¶ 6. About June 10, 1981 and September 18–20, 1981, Olson met with Iwasaki in Wisconsin to help prepare the application. Olson ¶ 5. · On October 12, 1981, Iwasaki had dinner with Chase in Los Angeles. Iwasaki ¶ 7. Kinoshita met with Chase in Los Angeles on February 7, 1982 to discuss problems involved with the FCC application. Kinoshita ¶ 7. Again, Olson met with Iwasaki in Wisconsin on June 6, 1982 to help prepare the application. Olson ¶ 5. Finally, on June 10, 1982, Iwasaki met again with Chase. Iwasaki ¶ 9.

Two meetings took place in the District of Columbia. On September 25–26, 1981, Iwasaki met with Chase. Chase ¶ 7. During that meeting, Iwasaki agreed to a plan to negotiate with other competing FCC applicants about a possible merger of several applications. Chase ¶ 7. Iwasaki authorized Chase to secure the assistance of other law firms and agents to investigate the competing applicants. Iwasaki also asked Chase to make preliminary inquiries concerning Iwasaki's current business arrangements with a Los Angeles television station. *Id.* Additionally, Iwasaki raised the possibility of developing a business to provide Japanese language broadcasts in several other major cities.[7]

---

**5.** Olson expected to become the general manager of Pan-Pacific if the application were successful. Olson ¶ 3; Answers of Defendant to Plaintiff's Interrogatories No. 2. The Pan-Pacific application was not however successful.

**6.** Both Kinoshita and Olson traded their professional services for these shares while Iwasaki bought his shares through direct financing. Apparently, only 100 shares were issued for both Pan-Pacific and Miko.

**7.** Iwasaki characterized his stay in the District

The second visit in the District of Columbia was on February 15 or 16, 1982 between Chase, Iwasaki, and Olson. Chase ¶ 8; Iwasaki ¶ 8; Olson ¶ 6. The meeting was in preparation for the FCC proceedings on the Pan-Pacific application. Iwasaki ¶ 8; Chase ¶ 8; Olson ¶ 6. In addition to these two visits, Chase had numerous telephone conference calls with Iwasaki, Olson, and Kinoshita from Chase's Washington office. Chase–2 ¶ 10.

Under the terms of the July 4, 1980 letter, Chase's primary function was to obtain a television license from the FCC for Pan-Pacific Broadcasting. Complaint, exhibit a. However, Chase performed other services which were not related exclusively to his contacts with the FCC. Chase–1 ¶ 9. He assisted the defendants with their business organization and corporate operations, prepared a press release regarding the activities of the defendants, assisted with the development of television programming plans, and made arrangements and contracts with engineers and other consultants regarding establishment of the defendants' broadcast operations and equipment acquisitions. *Id.* While some aspects of these business activities were included in material submitted to the FCC, they did not in all instances have a particular or necessary relationship to the FCC application. *Id.*

### B. *Procedural Background*

Although he received some payments, Chase did not collect all his claimed attorney's fees. Consequently, he filed a complaint in the Superior Court of the District of Columbia against Pan-Pacific, Miko, Iwasaki, Kinoshita, and Olson, charging breach of contract and quantum meruit. Chase claimed that the defendants were jointly and severally liable for $71,718.43 in unpaid legal fees. Complaint ¶¶ 8, 11. The case was removed to federal court, and on June 24, 1983, Pan-Pacific filed an answer and counterclaim. Answer and Counterclaim of Pan-Pacific (filed June 24, 1983). The other defendants filed answers which

"incorporated" Pan-Pacific's counterclaim in their list of defenses. Answer of Kinoshita (filed June 24, 1983); Answer of Miko (filed June 24, 1983); Answer of Iwasaki (filed June 24, 1983); Answer of Olson (filed June 24, 1983).

The Pan-Pacific counterclaim asserted three counts. First, Pan-Pacific alleged that Chase had disclosed confidential information to United American Telecasters, Inc. (United American), a company which had filed a competing application for the broadcast license. Second, Pan-Pacific claimed that Chase had negligently performed services for Pan-Pacific. For example, Pan-Pacific charged that Chase had incorrectly advised Pan-Pacific that it could secure a broadcast license with Iwasaki as the only financial investor. Finally, Pan-Pacific alleged that Chase had misrepresented the cost of filing an application for a broadcast license and of prosecuting the application before the FCC. Answer and Counterclaim of Pan-Pacific at 5–8.

On August 10, 1983, Miko and the individual defendants moved to dismiss the complaint for lack of personal jurisdiction. *See* Motion of Defendants Miko, Kinoshita, Iwasaki, and Olson to Dismiss the Complaint (filed Aug. 10, 1983); Opposition of Plaintiff to Motion to Dismiss (filed Aug. 22, 1983); Supplemental Memorandum and Points of Authorities for Defendants (filed Aug. 30, 1983). Pan-Pacific did not join in this motion. On November 10, 1983, the district court denied the motion, holding that the defendants' adoption of Pan-Pacific's counterclaim waived any challenge to the court's exercise of personal jurisdiction. Memorandum and Order (filed Nov. 10, 1983). The court of appeals reversed and remanded the case to the district court "for prompt airing and decision of the objections to personal jurisdiction raised by Miko and the individual defendants." *Chase v. Pan-Pacific Broadcasting, Inc.*, 750 F.2d 131, 134 (D.C.Cir.1984).

---

of Columbia as "primarily a weekend social visit." Iwasaki Supplemental Affidavit (filed Sept. 26, 1983). Iwasaki simply noted that "Chase described some of the things he was doing on the [Pan-Pacific] license application

before [the FCC]." *Id.* Since the affidavits conflict on this point, we must resolve any reasonable discrepancy in the plaintiff's favor. *See, supra,* note 1.

On January 18, 1985, we requested the parties to submit updated memoranda on the question of personal jurisdiction.[8] Status Call (Jan. 18, 1985). On April 22, 1985, both the plaintiff and defendants filed their supplemental memoranda. Supplemental Memorandum of Points and Authorities in Support of Motion of Defendants Miko Enterprises, Inc., Dennis K. Kinoshita, Masataka Iwasaki, and Charles R. Olson to Dismiss the Complaint (filed Apr. 22, 1985); Plaintiff's Memorandum in Response to Status Call (filed Apr. 22, 1985). After considering these memoranda, we entered an order on June 7, 1985 finding "that the plaintiff has made a prima facie showing of in personam jurisdiction over Masataka Iwasaki, Miko Enterprises, Inc., and Pan-Pacific Broadcasting, Inc." We held, however, that Chase "failed to establish such a showing with regard to Dennis K. Kinoshita or Charles R. Olson." We accordingly dismissed the complaint as to Kinoshita and Olson. In our order, we promised this memorandum to explain our decision. Order (filed June 7, 1985).

## II. *Discussion*

To determine whether we may exercise jurisdiction over Miko and the individual defendants, we follow a three-part analysis. Section One outlines the general principles which govern jurisdictional questions. Section Two applies those principles to the defendants in this case. And Section Three examines the applicability of the so-called "government contacts" doctrine.

### 1. *Jurisdictional Principles*

Our court may assert personal jurisdiction over the defendants if the plaintiff fulfills two conditions. First, the plaintiff must demonstrate that the District of Columbia longarm statute authorizes service of process over the defendants,[9] and, second he must show that such a provision is consistent with the constitutional principles of due process. *Margoles v. Johns*, 483 F.2d 1212, 1220 (D.C.Cir.1973). We review below the underlying concepts of the District of Columbia longarm statute and the due process clause.

#### a. *District of Columbia Longarm Statute*

The parties agree that D.C.Code § 13–423(a)(1) (1981) is the applicable longarm statute in this case. Plaintiff's Brief on the Jurisdictional Issue at 3 (filed Apr. 22, 1985); Memorandum of Points and Authorities in Support of Motion to Dismiss at 4 (filed Aug. 10, 1983). That provision provides:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's (1) transacting any business in the District of Columbia.

D.C.Code § 13–423(a)(1).

Congress passed this longarm statute as part of the District of Columbia Court Reform and Criminal Procedure Act of 1970. Pub.L. No. 91–358, 84 Stat. 473. The legislative history consists almost entirely of two short references in the House and Senate committee reports. The House Committee on the District of Columbia reported:

> Section 132 on civil jurisdiction and service outside the District of Columbia is modeled on the Uniform Interstate and International Procedure Act, more specifically grants expanded bases of jurisdiction and modes of service identical to or reciprocal with those provided under the laws of the nearby State of Maryland for the courts of that State, and substantially the same as those provided in the. adjacent State of Virginia and approximately ten other States.

---

**8.** On January 22, 1985, we also ordered the parties to resume discovery which was limited to the jurisdictional issue. Order (filed Jan. 22, 1985).

**9.** In a diversity case, Fed.R.Civ.P. 4(e), (f) authorizes a federal court to look to the law of the forum to determine whether the court may exercise jurisdiction over a noninhabitant. *United States v. First Nat'l City Bank*, 379 U.S. 378, 381, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1965); *Ramamurti v. Rolls-Royce Ltd.*, 454 F.Supp. 407, 408 (D.D.C.1978) ("it is largely settled that, in a diversity case, questions of amenability to service and personal jurisdiction are determined by reference to the law of the forum state.").

H.R.Rep. No. 907, 91st Cong., 2d Sess. 61 (1970). And the Senate Committee on the District of Columbia similarly wrote:

A new chapter (4) is added, incorporating a modified version of the first two articles of the Uniform Interstate and International Procedure Act. The uniform provisions codify recent case law with respect to extraterritorial jurisdiction over and service upon persons in civil litigation, and supply the reorganized trial bench of general jurisdiction with a necessary procedural adjunct. Chapter 4 more specifically grants expanded bases of jurisdiction and modes of service identical to or reciprocal with those provided under the laws of the nearby State of Maryland for the courts of that State, and substantially the same as those provided in the adjacent State of Virginia and approximately 10 other States.

S.Rep. No. 405, 91st Cong., 1st Sess. 35 (1969).

From this brief history, we can ascertain that "Congress' overall intent was to provide the District's courts, to the greatest extent possible, with essentially identical longarm jurisdiction as was then available in Maryland and Virginia." *Margoles v. Johns*, 483 F.2d at 1216. Indeed, the Virginia and Maryland longarm statutes are essentially identical to the District of Columbia provision. Va.Code § 8.01–328.-1(a)(1) (1950) ("court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's: 1. Transacting any business in this Commonwealth ....,"); Md.Ct. & Jud.Proc.Code Ann. § 6–103 (1957) ("A court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State."). As our circuit court explained, "obviously, the geographical proximity of those jurisdictions and the constant flux caused by the transpontination of their residents rendered action such as that taken by Congress both wise and necessary." *Margoles v. Johns*, 483 F.2d at 1216. Consequently, in construing the District of Columbia longarm statute, federal and local courts often adopt the statutory

constructions which the Virginia and Maryland courts place on their longarm statutes. *See, e.g., Founding Church of Scientology v. Verlag*, 536 F.2d 429, 433 (D.C.Cir.1976) ("substantial weight given to construction of Virginia and Maryland statutes); *Mitchell Energy Corp. v. Mary Helen Coal Co., Inc.*, 524 F.Supp. 558, 563 (D.D.C.1981) ("The District of Columbia courts take guidance from the neighboring jurisdictions of Maryland and Virginia in the interpretation of their longarm statute."); *Rose v. Silver*, 394 A.2d 1368, 1369 (D.C.1978) ("We have recognized that in enacting the longarm statute, D.C.Code 1973, § 13–423, Congress intended to provide District of Columbia courts with in personam jurisdiction equivalent in scope to that in effect in the neighboring states of Maryland and Virginia.") (citations omitted).

Following the jurisprudence of the Maryland and Virginia courts, the District of Columbia Court of Appeals has extended section 13–423(a)(1) to the limits of due process. *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 810–11 (D.C.1976) (en banc) (citing *Kilbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 180 S.E.2d 664 (1971); *Groom v. Margulies*, 257 Md. 691, 265 A.2d 249 (1970); *see also Hummel v. Koehler*, 458 A.2d 1187, 1190 (D.C.1983); *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C.1981) (en banc), *cert. denied*, 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982). As a result, our only inquiry with respect to section 13–423(a)(1) is whether exercising jurisdiction over the defendants would violate the principles of due process. *Smith v. Jenkins*, 452 A.2d 333, 336 (D.C. 1982).

Although we must accept the District of Columbia Court of Appeals' construction that section 13–423(a)(1) reaches the limits of due process, we are not obliged to follow that court's interpretation of the due process clause. *See Empire Abrasive Equipment Corp. v. H.H. Watson, Inc.*, 567 F.2d 554, 556 n. 1 (3d Cir.1977). Rather, we may, as we do here, "assess independently the constitutional permissibility of the exercise of jurisdiction" in accordance with fed-

eral law. *Simkins Corp. v. Gourmet Resources International,* 601 F.Supp. 1336, 1340 (E.D.Penn.1985); *Holfield v. Power Chemical Co., Inc.,* 382 F.Supp. 388, 392 (D.Md.1974).

## 2. *Due Process*

The due process clause limits a court's power to exercise personal jurisdiction over a nonresident. *Pennoyer v. Neff,* 95 U.S. (5 OTTO) 714, 24 L.Ed. 565 (1877). A court cannot require a nonresident to defend in a forum which is not constitutionally "reasonable, in context of our federal system of government...." *International Shoe Co. v. Washington,* 326 U.S. 310, 317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). "The Due Process Clause, by ensuring the 'orderly administration of the laws' ... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Burger King Corp. v. Rudzewicz,* —— U.S. ——, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Accordingly, the general rule. is that personal jurisdiction is proper only if the defendant's contacts with the forum allow the maintenance of a suit which "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. at 316, 66 S.Ct. at 158.

This "minimum contacts" rule is not susceptible to mechanical application but will vary with the quality and nature of the defendant's activity. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed. 1283 (1958). "[T]he facts of each case must be weighed to determine whether the requisite affiliating circumstances are present." *Kulko v. Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978).

Nevertheless, the "defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Wilson,* 444 U.S. at 297, 100 S.Ct. at 567. This connection arises when the defendant "purposefully direct[s]" his activities at residents of the forum, *Keeton v. Hustler Magazine Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1978), and not when "those who claim some relationship with the nonresident defendant" simply act unilaterally, *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1239. When the defendant does purposefully direct his activities toward forum residents, three reasons exist as to why a forum may exercise personal jurisdiction over that defendant:

[First,] a State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. [Second,] where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. [Third,] because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to to such activity.

*Burger King Corp. v. Rudzewitz,* 105 S.Ct. at 2183 (citations omitted).

With respect to interstate contractual obligations, the Supreme Court has "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 2183 (quoting *Travelers Health Association v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950). Indeed, "it is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with the state." *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

### 2. Personal Jurisdiction Over Defendants

With the above observations in mind, we now examine whether we may exercise personal jurisdiction over the defendants in this case.

#### a. Kinoshita and Olson

■ Kinoshita and Olson have so few contacts with this forum that they could not "reasonably anticipate being haled" into this court. Kinoshita is a California resident and has never visited the District of Columbia for reasons concerning the Pan-Pacific application. Kinoshita ¶¶ 2, 9. Olson only once accompanied Iwasaki to the District of Columbia to discuss with Chase the Pan-Pacific application. Olson ¶ 6. Although Kinoshita and Olson talked with Chase during telephone conference calls, corresponded by mail with Chase, and attended meetings outside the District of Columbia, see *Winston v. Town Heights Development*, 376 F.Supp. 1214, 1216 (D.D. C.1974) (minimum contacts may include a phone conversation ratifying agent's contract), Kinoshita and Olson apparently played only a minimal role in these activities since Iwasaki "made all of the business decisions with respect to the preparation and prosecution of the license application." Chase–2 ¶ 8.

Chase argues that Kinoshita and Olson purposely directed their activities towards the District of Columbia because they supposedly "ratified Defendant Iwasaki's appointment of [Chase] as agent by virtue of voluntarily joining the business venture after the agency relationship was established." Plaintiff's Brief on the Jurisdictional Issue at 7 & n. 4 (filed Apr. 22, 1985). Before a person can ratify the appointment of an agent, however, he must have "full knowledge" "of the representations, terms or conditions which [were] made as part of the transaction." 2A C.J.S. *Agency* § 73 (1972). Here, Chase has presented no evidence that either Kinoshita or Olson knew about the July 4, 1980 letter or the terms of the oral agreement with Chase. Accordingly, we are not prepared to accept Chase's conclusory statement that Kinoshi-

ta or Olson ratified the appointment of Chase. *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C.Cir.1983) (certain "conclusory statement[s] [do] not constitute the prima facie showing necessary to carry the burden of establishing personal jurisdiction"), *cert. denied*, —— U.S. ——, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984); *Holfield v. Power Chemical Co., Inc.*, 382 F.Supp. at 390 ("Mere averments of jurisdiction are not enough nor may conclusory unsupported statements contained in the accompanying affidavits be relied upon to demonstrate jurisdiction.").

#### b. Iwasaki

■ In contrast to Olson and Kinoshita, we believe that Iwasaki "purposely directed his activities at the residents" of the District of Columbia and therefore maintained the necessary "minimum contacts" with this forum. Iwasaki initiated the business relationship with Chase, a Washington lawyer, expressed his desire to secure Chase as an attorney, and agreed to Chase's fee arrangements. *See* Casad, Jurisdiction in Civil Actions ¶ 8.11[1][a] (1983) (courts give great weight to fact that defendant initiated contact) [hereinafter cited as Civil Actions]. And Iwasaki, presumably directed Chase's work in the District since Iwasaki undertook all the business decisions in pursuing the application. Chase–2 ¶ 8. Finally, Iwasaki's contacts—besides telephone conversations and correspondence—included two important business trips to Washington to discuss the FCC application and other legal matters with Chase.

Iwasaki asserts that the doctrine of the fiduciary shield applies in this case. Under that doctrine, if a person acts for a corporation, and not for himself, the jurisdiction over the individual cannot be predicated on those acts. That is, when the individual acts in a fiduciary capacity for the corporation, he is shielded from exposure to personal jurisdiction. *See generally* Civil Actions ¶ 4.03[3]. Iwasaki accordingly concludes that because all his contacts with the District arose from his activities as promoter or agent for Pan-Pacific, jurisdiction over the individual Iwasaki cannot be predicated on those acts.

The fiduciary shield doctrine "is one purely of statutory construction," *Columbia Briargate Co. v. First National Bank,* 713 F.2d 1052, 1055–57 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984), since the doctrine reflects a judicial interpretation of the phrase "transacting business." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 n. 2 (2d Cir.1981) ("The fiduciary shield doctrine is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the longarm statute."). In other words, the courts applying the fiduciary shield doctrine hold that it is the corporation—and not the individual who acts for the corporation—which is "transacting business" under the relevant longarm statute. *See, e.g., Washington Scientific Industries v. American Safeguard Corp.,* 308 F.Supp. 736, 739 (D.Minn. 1970) (agent does not "transact business").

Since the fiduciary shield doctrine is a question of statutory construction, we must examine District law to determine whether this doctrine applies to the District longarm statute. We find no District case which addresses this issue, but—in accordance with the legislative history of the District longarm statute—we look to Virginia and Maryland law for guidance.

■ Virginia courts are silent on the question, but Maryland courts are not. In *Copiers Typewriters Calculators v. Toshiba Corp.,* the United States District Court for the District of Maryland acknowledged that the "transacting business" "section of the longarm statute ... extends to the full limits of the Due Process Clause." 576 F.Supp. 312, 329 (D.Md.1983). Therefore,

the court concluded, "the fiduciary shield doctrine, a result of statutory construction of a longarm statute which did not go to the utmost limits of due process, does not apply [here] ... nor does disregarding that doctrine offend an integral part of due process." *Id.* (citations omitted); *cf. Quinn v. Bowmar Publishing Co.,* 445 F.Supp. 780, 785–87 (D.Md.1978) (fiduciary shield doctrine applies to other sections of longarm statute which apparently do not go to full extent of due process clause). The Court of Appeals of Maryland offered another reason for rejecting the fiduciary shield doctrine:

> The [longarm] statute makes the test of jurisdiction in the *present* circumstances, the transaction of *any* business without any qualification. [The defendant] did transact business in Maryland and Maryland has personal jurisdiction over him. His *defense* that *he is not liable* because he was acting for a disclosed corporate principal goes to the *merits* of the case, not to the *power* of the court to make the adjudication.

*Groom v. Margulies,* 265 A.2d at 255 (emphasis in original). Commentators have voiced similar criticisms, stressing that the doctrine confuses procedural and substantive questions and unreasonably immunizes from jurisdiction one who in fact acted in the forum state. *See, e.g.,* Civil Actions ¶ 4.03[3] (1983); Sponsler, *Jurisdiction Over the Corporate Agent: the Fiduciary Shield,* 35 Wash. & Lee L.Rev. 349 (1978) (suggesting that fiduciary shield makes no sense when corporate agent has entered forum). We accept this guidance from the Maryland courts and legal scholars and accordingly hold that the fiduciary shield does not apply to section 13–423(a)(1).[10]

---

10. We note that the Court of Special Appeals of Maryland, a lower Maryland court, suggested that the fiduciary shield doctrine may apply to three provisions in the Maryland longarm statute, including the "transacting business" provision. *Umans v. PWP Serv., Inc.,* 50 Md.App. 414, 439 A.2d 21, 25 (1982). The *Umans* court attempts to distinguish *Groom* by stating: "Also not involved here is another exception where the corporation and the individual reading of *Groom* suggests that any close identity between the corporation and the individual played no role in the court of appeals opinion." *But see*

*Feldman v. Magnetix Corp.,* 50 Md.App. 308, 437 A.2d 895, 897 n. 2 (1981) (lower court suggesting such distinction in dictum).

In determining state law, the decisions of the state's highest court are accorded the greatest weight. *See generally* 8 Fed.Proc., L.Ed. § 20:377 (1982). And the court should not follow the decision of an intermediate appellate state court when the intermediate decision is contrary to the highest court. *Id.* at § 20:378. Because we believe *Umans* is contrary to *Groom,* we follow *Groom. Cf. Cawley v. Bloch,*

#### c. *Pan-Pacific*

In their motion to dismiss, Miko and the individual defendants noted: "Pan-Pacific Broadcasting, Inc. has not yet determined whether it will file a motion to dismiss, although the decisions discussed in this memorandum suggest that there is no jurisdiction over the corporation." *See* Memorandum of Points and Authorities in Support of Motion to Dismiss of Defendants Miko Enterprises, Inc., Dennis K. Kinoshita, Masataka Iwasaki and Charles R. Olson at 2 n. 1. However, as will become clear below, we must first ask whether we may exercise jurisdiction over Pan-Pacific before we can determine whether jurisdiction is proper over Miko. Accordingly, we raise this first question, concluding that we have jurisdiction over Pan-Pacific.

As with the individual defendants, we must determine whether Pan-Pacific has "minimum contacts" with the District of Columbia. Since corporations have no physical existence, courts often look to the activities of the corporate agents to determine whether sufficient contacts exist. *See, e.g., Thermo-Cell Southeast, Inc. v. Technetic Industries*, 605 F.Supp. 1122, 1124 (N.D.Ga.1985); *Korb v. P.F.R. Corp.*, 101 F.R.D. 56, 58–59 (S.D.Ohio 1984); *cf.* Civil Actions ¶ 2.02[3][c][i] (jurisdiction over officer of corporation usually enables court to exercise personal jurisdiction over corporation). Additionally, preincorporation actions of a promoter of a corporation, when coupled with postincorporation ratification by the corporation, may justify the exercise of personal jurisdiction over the corporation in the forum of the preincorporation activities. *Rees v. Mosaic Technologies, Inc.*, 742 F.2d 765, 768–69 (3d Cir.1984) (allowing jurisdiction based on ratified preincorporation activities).[11]

Here, Iwasaki acted as a promoter for Pan-Pacific when he first contacted Chase and expressed the desire to acquire a broadcast station. And, Iwasaki, as an agent for Pan-Pacific, met twice with Chase in the District to discuss the Pan-Pacific application, undertaking the business decisions for Pan-Pacific. Although Iwasaki's initial contact with Chase occurred before the incorporation of Pan-Pacific, we feel that the company ratified this contact by paying the legal bill which covered Chase's services before the incorporation of Pan-Pacific. *See* Supplemental Memorandum (filed Aug. 30, 1983) (bill paid September 24, 1980); 3 Am.Jur.2d *Agency* § 161 (1963) ("ratification may be implied from any act, words, or course of conduct on the part of the principal which reasonably tends to show an intention on his part to ratify the unauthorized acts or transactions of the alleged agent."); *Lewis v. Washington Metro Area Transit Authority*, 463 A.2d 666, 672 (D.C.1983) ("The principal may ratify the act expressly or impliedly, by conduct inconsistent with any other hypothesis."). Accordingly, because we believe that Iwasaki's contacts with this jurisdiction rise to the level of minimum contacts, this court may exercise personal jurisdiction over Pan-Pacific.

#### d. *Miko*

"Long-arm derivative jurisdiction over a foreign parent corporation has been found where the parent so controlled and dominated the activities of its resident subsidiary that the latter's separate corporate existence was in effect disregarded." *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*, 519 F.2d 634, 637 (8th Cir.1975); *accord Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. 1182, 1200 (D.D.C.1984) (in order for parent corporation to be amenable to suit in particular district based on activities of subsidiary there, it must exercise control relationship over subsidiary); *Lavrov v. NCR Corp.*, 591 F.Supp. 102, 109 (S.D.Ohio 1984) ("courts have relied on the presence

544 F.Supp. 133, 135–36 (D.Md.1982) (citing *Umans* as precedent for applying fiduciary shield doctrine but longarm provision in question was not "transacting business" provision).

**11.** The acts of ratification relate back to the time of the original activities and establish an agency relationship permitting the acts of the promoter to constitute, in effect, acts done by the corporation. *Ress v. Mosaic Technologies, Inc.*, 742 F.2d at 769.

of a parent or subsidiary to assert jurisdiction over the other when the subsidiary is considered a mere instrumentality of the parent."). Similarly, the Court of Appeals of Maryland—a court from which we should take guidance pursuant to the legislative history of the District longarm statute—explained that "in order to hold the corporate veil inviolate, at least insofar as jurisdiction is concerned, it is necessary as a factual matter that a corporation have some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." *Harris v. Arlen Properties, Inc.*, 256 Md. 185, 260 A.2d 22, 29 (1969); *but see Vitro Electronics v. Milgray Electronics, Inc.*, 255 Md. 498, 258 A.2d 749, 753 (1969) (stressing need to avoid "breaking down observed distinctions between parent and subsidiary corporations, where fraud or deception is not present."). Since "[n]o all embracing rule has been laid down under which the relationship between two corporations may be determined," "[t]he circumstances in each case must be examined to determine whether a corporation through the activities of another corporation has subjected itself to jurisdiction in a state under its longarm statute." *Fisher v. First National Bank*, 338 F.Supp. 525, 529 (S.D.Iowa), *appeal dismissed*, 466 F.2d 511 (8th Cir.1972); *but see Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. at 1200–01 (listing many factors that court should at least consider).

■ It is apparent that Miko, a parent corporation, had no reason for its existence other than to control Pan-Pacific, its subsidiary. The incorporaters organized Miko to own 80 percent of Pan-Pacific stock, and they expressly stated that the company had no other purpose than to own that stock. *See, e.g.,* Iwasaki ¶ 4. The officers, directors, and shareholders for Miko were the same three for Pan-Pacific. Iwasaki Deposition at 15. Miko had no employees and no physical assets. The company's only source of funding came from Iwasaki who also financed Pan-Pacific. *Id.* at 17–20. And the offices of both corporations were at the same address *Id.* at 4, 17.

Accordingly, we attribute, for jurisdictional reasons, the Pan-Pacific contacts to Miko and hold that, based on those contacts, the court may exercise personal jurisdiction over Miko.

### 3. *Government Contacts Doctrine*

■ The defendants Iwasaki, Miko, and Pan-Pacific argue that the "government contacts" doctrine prevents this court from exercising jurisdiction over them. Basically, the "government contacts" doctrine precludes the assertion of personal jurisdiction over a non resident entering the District of Columbia if the only contact the non-resident has with the District is with Congress or a federal agency. *See Environmental Research Institute, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d at 813. This doctrine originally developed from cases holding that the newsgathering services of newspaper offices did not constitute jurisdictional contacts. *See, e.g., Neely v. Philadelphia Inquirer Co.*, 62 F.2d 873 (D.C.Cir.1932). The doctrine was later expanded to include corporate contacts with Congress or federal agencies for the purpose of lobbying or obtaining governmental information. *See Mueller Brass Co. v. Alexander Milburn Co.*, 152 F.2d 142, 144 (D.C.Cir.1945).

The recent case law on the government contacts doctrine is not clear, however. In *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.*, an environmental consulting firm in the District of Columbia, Environmental Research International, Inc. offered to assist a foreign corporation, Lockwood Greene Engineer, Inc. (Lockwood) "by collecting data from which to prepare· a construction grant application to be submitted to the Environmental Protection Agency (EPA) and by assisting in processing the grant through the EPA." 355 A.2d at 810. The parties reached an agreement which Lockwood allegedly breached. ERI brought suit, and Lockwood moved to quash service of process and dismiss the complaint for lack of personal jurisdiction.

The court of appeals examined several supposed contacts that Lockwood had with the District of Columbia, including "two visits to the District of Columbia to meet with EPA officials." *Id.* at 812. With respect to those two visits, the en banc panel applied the "government contacts" doctrine, stating:

> The rationale for the "government contacts" exception to the District of Columbia's long-arm statute does not hinge upon the wording of the statute. Rather, it finds its source in the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire national citizenry. To permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum.

*Id.* at 813 (footnotes omitted).

Two years later, however, a three-judge panel of the District of Columbia Court of Appeals appeared to limit the government contacts exception to activities implicating only first amendment rights. *Rose v. Silver*, 394 A.2d at 1372–74. In *Rose v. Silver*, the plaintiff sued defendants to recover attorney fees. A Connecticut corporation and its president, the defendants, had hired an attorney, the plaintiff, to go to Washington to negotiate with and if necessary to litigate against the Food and Drug Administration. The court held that the attorney was the agent for the corporation and that since defendants were transacting business in the District through an agent, they were amenable to long-arm service in the District of Columbia.

With respect to the government contacts doctrine, the panel stated:

> After reviewing the development of the government contacts principle, we conclude that the First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia, when its contacts are covered by the long-arm statute and are sufficient to withstand a traditional due process attack. Whereas historically the government contacts principle was a way of articulating a limitation of the [former] "doing business" provision of the long-arm statute, having both due process and First Amendment roots, it is clear to us that amendment of the long-arm statute to provide for a "transacting any business" standard, while not erasing the government contacts principle, ... had shifted its premise solely to the First Amendment.

394 A.2d at 1374 (citation and footnote omitted). Without deciding whether the government contacts doctrine applied to the case, the panel remanded the action for further considerations.

In denying a rehearing en banc in the Rose case, the full court failed to explain or reconcile a possible conflict with the *Environmental Research* opinion. One judge found none and two other judges called for rejection of the panel opinion in *Rose*. *Rose v. Silver*, 398 A.2d 787, 787–91 (D.C. 1978); *see Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. at 1198. Without resolving the issue, our circuit court observed:

> [T]he [District of Columbia Court of Appeals has] failed to clarify any possible conflict [between *Environmental Research* and *Rose*.] Inasmuch as the denial of rehearing is evidence that no irreconcilable tension exists between the en banc opinion and a subsequent panel opinion, and considering that a panel of the District of Columbia Court of Appeals "is prohibited from issuing an opinion which conflicts materially with a prior decision of [the full] court as this may be done only by the court sitting en banc," if it were necessary to determine what law controls today in the District of Columbia, we would still be hesitant to conclude that the clear holding against governmental contacts as a basis for jurisdiction in *Environmental Research* no longer controls.

*Naartex Consulting Corp. v. Watt*, 722 F.2d at 786 (citations omitted).

Fortunately, we need not resolve any possible tension between *Rose* and *Environmental Research* since under either theory, the government contacts doctrine does not apply to this case. Initially, we note that Chase's legal services, his meetings, and conversations with Iwasaki were not restricted to the FCC application. At the first meeting in the District, for example, Iwasaki asked Chase to make inquiries concerning Iwasaki's business arrangements with a Los Angeles television station. Additionally, Iwasaki raised the possibility of developing a business to provide Japanese language broadcasts in several other major cities. Since these matters did not directly concern the application before the FCC, the applicability of the government contacts doctrine is questionable from the start.

█ But even if all these matters did concern the FCC application, we would nevertheless hold that the government contacts doctrine does not apply to this case where (1) the cause of action arises from a professional relationship between a former client and the attorney who had represented the client before a federal agency, (2) the "minimum contacts" with the District are limited to contacts between the client and the attorney and do not include contacts between the client or attorney and the federal agency, and (3) the agency does not restrict representation before the agency to members of the District of Columbia bar.

According to the court in *Environmental Research*, one rational behind the government contacts doctrine may "find[ ] its source in the unique character of the District as the seat of national government," so the doctrine applies where the "sole contact with the District consists of dealing with a federal instrumentality." 355 A.2d at 813. Although not conclusive, this language suggests that the *Environmental Research* court was addressing direct governmental contacts with a federal

agency and not contacts with counsel who in turn appear before the agency. In fact, in other cases which have invoked the government contacts doctrine, the contacts in issue have always been direct contacts between the defendant and the "federal instrumentality" and not ones between the defendant and his attorney or agent who later appears before a federal agency.[12] *See, e.g., Naartex Consulting Corp. v. Watt*, 722 F.2d at 786 (Washington office directly monitored legislative and regulatory matters and maintained contacts with Congress and the executive branch); *Mueller Brass Co. v. Alexander Milburn Co.*, 152 F.2d at 143 (Washington office gathered and communicated information from and to government departments and agencies); *Investment Co. Institute v. United States*, 550 F.Supp. 1213, 1217 & n. 6 (D.D.C.1982) (bank filings with SEC and application to SEC-affiliated trade association); *Environmental Research Institute Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d at 813 (defendant visits EPA officials); *cf. Siam Kraft Paper Co., Ltd., v. Parsons & Whittemeore, Inc.*, 400 F.Supp. 810, 811 (D.D.C.1975) (government contacts principle "denies personal jurisdiction over non-residents whose only contact with this jurisdiction involves *uniquely* governmental activities.") (emphasis added).

Additionally, though the defendants could only receive a television license from the FCC in Washington, FCC regulations did not require the defendants to hire a Washington lawyer to represent their interests before the FCC. *See* 47 C.F.R. § 1.23 (1983) (FCC rule of practice and procedure allows any attorney who is a member in good standing of a state bar to practice before it). Therefore, the defendants could, for example, have retained and consulted with a Virginia lawyer in Virginia who would in turn appear before the FCC. Yet, according to the defendants interpretation of the "government contacts" doctrine, as set forth in *Environmental Research*, though a Virginia federal court

---

**12.** *Rose* did suggest that the minimum contacts resulted from the professional relationship between the defendants and their attorney. However, the *Rose* court, in remanding the case, never decided whether the government contacts doctrine covered those contacts.

could exercise jurisdiction based on contacts with the Virginia lawyer who represented his client before the FCC, we could not do so here. In both cases the attorney represents the client before the FCC in Washington, but in one the court may find jurisdiction on contacts with the attorney and in the other it cannot. We find this distinction without merit.

Nor does our decision contravene the holding in *Rose* and abridge the defendants freedom of speech or right to petition the government. As noted above, this is not a case where the "minimum contacts" are between the defendants and a federal agency in the District. In that case, the assessment of jurisdiction may be unconstitutional because the defendant is forced to enter this forum to exercise his first amendment rights. *See Naartex Consulting Corp. v. Watt,* 722 F.2d at 787. Rather, the contacts in this case are those between the attorney and client. And, although the attorney must appear in Washington to voice the defendant's views before an agency, the defendants are not required to enter Washington to obtain legal representation: they may freely choose their attorney, the location of their attorney, and the site of their dealings with that attorney. In this case, the defendants simply chose to deal with a Washington attorney as opposed to an attorney outside of Washington. Therefore, we do not believe that constitutional concerns require this court to invoke the government contacts doctrine.

### III. *Conclusion*

For the above reasons, this court granted in part and denied in part the defendants' motion to dismiss.