Thomas F. **DOOLEY**, Plaintiff,

v.

**UNITED TECHNOLOGIES CORP.,
et al., Defendants.**

Civ. A. No. 91–2499.

United States District Court,
District of Columbia.

March 10, 1992.

**68**

Michael J. Madigan, Robertson T. Park, Michael J. Mueller, Akin, Gump, Hauer & Feld, Kenneth Michael Robinson, Cooter & Gell, Washington, D.C., for plaintiff.

William D. Iverson, Deborah A. Garza, Jeffrey B. Coopersmith, Covington & Burling, John D. Aldock, Laura S. Wertheimer, Shea & Gardner, Thomas F. Cullen, Jr., Christopher F. Dugan, Jones, Day, Reavis & Pogue, Thomas C. Papson, McKenna & Cuneo, Washington, D.C., for defendants.

## MEMORANDUM

JUNE L. GREEN, District Judge.

The plaintiff, Thomas Dooley, has brought an action against numerous defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act, Title 18, United States Code, sections 1961 *et seq.* ("RICO"), and supplemental state law claims. Several defendants, including the United Technologies Corporate ("UTC Corporate") defendants [1], the United Technologies Individual ("UTC Individual") defendants [2], defendants Olin E. Smith and Olin E. Smith & Associates ("Smith defendants"), defendant Westland, Incorporated

---

1. For the purpose of this Memorandum and Order, the UTC Corporate defendants include the following:

(1) United Technologies Corporation ("UTC"), a Delaware corporation with its principal place of business in Connecticut which allegedly manufactures and markets military equipment, including the Black Hawk helicopter;

(2) United Technologies Holding Corporation ("UT Holding"), a subsidiary of UTC, incorporated in Delaware, which allegedly holds and manages UTC's financial interest in defendant Westland Group PLC;

(3) Sikorsky, a division of UTC with its principal place of business in Connecticut which allegedly manufactures the Black Hawk helicopter;

(4) Sikorsky Saudi Arabia, Ltd. ("SASAL"), a UTC joint venture and/or limited liability company, established under the laws of the Kingdom of Saudi Arabia, with its principal place of business in Riyadh, Saudi Arabia, allegedly formed between defendant United Technologies International Operations, Inc. and defendant Thimar al-Jazirah Corporation;

(5) Sikorsky International Products, Inc. ("SIPI"), a UTC subsidiary, incorporated in Delaware with its principal place of business in Connecticut, which allegedly provides support services for helicopters sold by UTC to Saudi Arabia;

(6) United Technologies International Operations, Inc. ("UTIO"), a UTC subsidiary, incorporated in Delaware with its principal place of business in Guam, which allegedly formed a joint venture the with Saudi corporation Thimar.

2. For the purpose of this Memorandum and Order, the UTC Individual defendants include the following:

(1) Eugene Buckley, a citizen of Connecticut, who is President of Sikorsky;

(2) Robert F. Daniell, a citizen of Connecticut, who is the Chairman of the Board and Chief Executive Officer of UTC, and former President and Chief Executive Officer of Sikorsky;

(3) Joseph Homza, a citizen of Connecticut, who is Assistant Program Manager for SIPI and was formerly "contract liaison" for Sikorsky in St. Louis, Missouri;

(4) William F. Paul, a resident of Connecticut who is Senior Vice President of UTC in Washington, D.C., and former President of Sikorsky;

(5) Clement Charles Peterson, a citizen of Connecticut, who is Vice President for Middle East marketing for Sikorsky and was formerly plaintiff Dooley's supervisor;

(6) Robert Zincone, a citizen of Connecticut, who is the Director of the Technical Strategy, Science and Technology department at UTC and former President of Sikorsky.

("Westland, Inc.")[3], and defendant Frank E. Basil, Inc. ("Basil")[4] filed motions challenging jurisdiction and venue and seeking transfer. The Court held a hearing on February 28, 1992, to consider these motions. For the reasons set forth below, the Court finds that personal jurisdiction and venue are proper as to each defendant. The Court further finds that transfer to the District of Connecticut is not appropriate.

FACTS

Plaintiff Dooley's complaint sets forth allegations of a wide-ranging conspiracy encompassing foreign and domestic corporations individuals, and governments. At its root, the conspiracy set forth by the plaintiff is a bribery scheme between representatives of the Saudi Arabian government and Dooley's employer, defendant Sikorsky Aircraft ("Sikorsky"), in concert with its parent corporation, defendant United Technologies Corporation ("UTC"). UTC manufactures and sells military and commercial helicopters. Dooley alleges that throughout the late 1970's UTC actively solicited the Saudi Arabian government as a customer for its helicopters. Dooley further alleges that in 1986, the Saudi Arabian Ministry of Defense and Aviation ("MODA") finally agreed to purchase UTC helicopters. Dooley claims that to obtain the Saudi's business, UTC agreed to pay substantial bribes to Saudi Arabian officials and businessmen.

The conspiracy allegedly developed through tacit agreement between high-level UTC corporate employees and the Saudi Arabian Ambassador to the United States, His Royal Highness ("HRH") Prince Bandar bin Sultan ("Prince Bandar"), and Prince Bandar's Saudi Arabian associates. In its skeletal structure, the scheme described by plaintiff Dooley involved the sale of 13 UTC-manufactured Black Hawk helicopters to MODA through the Foreign Military Sales ("FMS") program administered by the Department of Defense and implicit promises for future sales. In exchange for the sales, UTC agreed to pay bribes to HRH Prince Khalid bin Sultan ("Khalid") and HRH Prince Fahad bin Sultan ("Fahad"), sons of MODA Minister Prince Sultan bin Abdul Aziz bin Saud, and Saudi Arabian businessman Ibrahim A. al-Namlah ("Namlah").

The bribes were to be funneled to the Saudi royalty through a business arrangement linking a Washington, D.C.-based corporation, Frank E. Basil, Inc., with a Saudi Arabian-based corporation, Thimar Al–Jazirah Corporation ("Thimar"). Through the influence of Saudi Arabian officials, including Prince Bandar, defendant Sikorsky was awarded a collateral contract for Maintenance Support Services ("MSS") to the FMS sale, without the normal competitive bidding of the contract. The UTC defendants then, in turn, contracted out for Personnel Support Service ("PSS") under the MSS contract, to the Basil–Thimar joint-venture. This mechanism allegedly allowed the UTC defendants to funnel bribes to Namlah and his "business partners", Khalid and Fahad, while circumventing United States Government oversight and audit procedures.

Namlah, the Saudi businessman designated by Prince Bandar to be UTC's "contact" in Saudi Arabia, is president and part-owner of Thimar. It is alleged that he used the payments from the Basil–Thimar joint venture to pay off Khalid and Fahad and to take a "cut" for himself.

Defendant Olin E. Smith & Associates, Inc. is a closely held corporation whose principal is General Olin E. Smith. Plain-

---

**3.** In addition to raising jurisdiction and venue challenges, defendant Westland seeks dismissal on grounds of the plaintiff's lack of standing, the complaint's failure to state a claim upon which relief can be granted, and because the application of the RICO statute to Westland, Inc. is unconstitutionally vague. The Court's ruling addresses only defendant Westland, Inc.'s jurisdiction and venue challenges. The Court reserves for consideration at a later date, Westland, Inc.'s merit challenges.

**4.** Defendant Basil originally sought dismissal for lack of service of process. The plaintiff served defendant Basil on February 28, 1992. Consequently, Basil filed a Notice of Withdrawal Of Motion To Dismiss For Lack Of Service Of Process. Defendant Basil's remaining motion seeks transfer to the District of Connecticut.

tiff Dooley alleges that Olin E. Smith, acting individually and on behalf of Olin E. Smith & Associates, Inc., played a key role in the conspiracy by acting as a go-between for the UTC defendants and Prince Bandar. Dooley claims that defendant Sikorsky retained General Smith to assist in its efforts to market the Black Hawk helicopter to the Saudi military. The plaintiff alleges that General Smith's close relationship with Prince Bandar was instrumental to UTC in obtaining the Ambassador's assistance in the bribery scheme.

Plaintiff Dooley alleges that Defendant Westland, Inc.'s involvement in the international conspiracy derives from its parent corporation, Westland Group PLC's, role in the affair. Dooley contends that as part of the alleged conspiracy, the UTC defendants agreed to the Saudi Arabian's demand that the Black Hawk helicopters be armed. Dooley alleges, that UTC, knowing the United States Government would not approve the sale of armed Black Hawks, sought the assistance of Westland Group PLC, a British manufacturer of military hardware in which UTC owned 7 percent stock. Dooley claims that the defendants conspired to amend a licensing agreement between UTC and Westland Group PLC so as to allow sales of armed Black Hawks to Saudi Arabia without the knowledge or approval of Congress, and the United States Government. According to the plaintiff, defendant Westland, Inc. played a role in attaining the amendment. Dooley contends that the Westland defendants' involvement in the conspiracy was critical in getting *armed* helicopters to the Saudi government.

ANALYSIS

I. PERSONAL JURISDICTION

■■■ The plaintiff has the burden of establishing that jurisdiction exists. *Lott v. Burning Tree Club, Inc.*, 516 F.Supp. 913, 918 (D.D.C.1980). Facts asserted by the plaintiff in his Complaint are presumed to be true unless directly contradicted by affidavit. *Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1284 (9th Cir.1977). However, where the parties are limited to written submissions, such as affidavits, the plaintiff need make only a *prima facie* showing to prevail on a motion to dismiss for want of jurisdiction. *Chase v. Pan–Pacific Broadcasting, Inc.*, 617 F.Supp. 1414 (D.D.C.1985).

Plaintiff Dooley raises several grounds which he argues give the Court personal jurisdiction over the defendants. The Court has carefully considered each argument. The Court finds two alternative bases on which to exercise personal jurisdiction over the defendants in this case. First, the Court finds that RICO provides for nationwide service of process under section 1965(d). Alternatively, the Court finds that it has personal jurisdiction over each defendant under the "transacting business clause" of the District of Columbia long-arm statute. Because the Court finds that it may exercise personal jurisdiction over all the defendants under either RICO section 1965(d) or section 13–423(a)(1) of the District of Columbia long-arm statute, it does not reach the question of whether any of the other grounds asserted by the plaintiff also support this Court's exercise of personal jurisdiction in this case.

*A. RICO § 1965(d)*

Title 18, United States Code, section 1965(d) provides:

All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent or transacts his affairs.

■■■ The section has been construed as a nationwide service of process provision. *See Bank of Crete, S.A. v. Koskotas*, 1991 WL 177287, \*1, 91 U.S. LEXIS 12169, \*4 (S.D.N.Y. Aug. 30, 1991); *Merchants Nat'l Bank v. Safrabank*, 1991 WL 173781, 1991 U.S. District LEXIS 12380 (D.Kan. Aug. 28, 1991); *University Savings Assn v. Bank of New Haven*, 765 F.Supp. 35, 36 (D.Conn.1991); *Omni Video Games, Inc. v. Wing Co., Ltd.*, 754 F.Supp. 261, 263 (D.R.I.1991); *American Trade Partners L.P. v. A–1 Int'l Importing Enter., Ltd.*, 755 F.Supp. 1292, 1302 (E.D.Pa.1990);

*Bridge v. Invest America, Inc.*, 748 F.Supp. 948, 951 (D.R.I.1990); *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1055 (S.D.N.Y.1987); *Soltex Polymer Corp. v. Fortex Indus. Inc.*, 590 F.Supp. 1453, 1458 (E.D.N.Y.1984). Under this section, the plaintiff's *prima facie* burden is met by showing that a defendant has contacts with the United States. Minimum contacts with the forum state, as required under the traditional long-arm jurisdiction analysis, is not necessary. A defendant's contact with the United States is sufficient to satisfy the requirements of due process. *Bank of Crete, S.A. v. Koskotas*, 1991 WL 177287, at *1, 91 U.S. Dist. LEXIS 12169, at *4, *quoting Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1055 (S.D.N.Y.1987) ("Where such nationwide service of process is authorized, a federal district court's jurisdiction is coextensive with the boundaries of the United States [and] due process requires only that a defendant in a federal suit have minimum contacts with the United States.")

■ All of the defendants served in this matter thus far, reside in the United States. The Court, therefore, has personal jurisdiction over each defendant under section 1965(d).

While the Court finds support in the case law from other circuits for its determination that section 1965(d) is RICO's nationwide service of process provision, it recognizes that the Court of Appeals in this circuit has not had the opportunity to address this issue. The Court, therefore, also considers whether personal jurisdiction is proper as to each defendant under the District of Columbia long-arm statute, concluding that it is.

### B. D.C. Long–Arm Statute D.C.Code § 13–423(a)(1)

The Court has personal jurisdiction over the defendants in this matter pursuant to the District of Columbia long-arm statute,

D.C.Code § 13–423(a)(1). This section provides:

> A District of Columbia Court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia.

In enacting the long-arm statute, Congress intended to expand the basis for jurisdiction in the District of Columbia. S.Rep. No. 405, 91st Cong., 1st Sess. 35 (1969); *see also Chase*, 617 F.Supp. at 1420. Section 13–423(a)(1) of the statute has been held to be coextensive with the Constitution's due process limits. *Crane v. Carr*, 814 F.2d 758 (D.C.Cir.1987); *Mouzavires v. Baxter*, 434 A.2d 988, 991–2 (D.C.App.1981) (en banc), *cert. denied* 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982).

■ However, the reach of a Court's jurisdiction under the "transacting business" clause is limited by Section 423(b) which provides, "only a claim for relief arising from the acts enumerated in this section may be asserted against [a defendant]." Consequently, a plaintiff seeking to carry his burden of proving personal jurisdiction under section 13–423(a)(1) must show: first, that the defendant transacted business in the District of Columbia; second, that the claim arose from the business transacted in D.C.; and third, that the defendant had minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *see also Avianca, Inc. v. Corriea*, 1991 U.S. LEXIS 7447, *5–*6 (D.D.C. May 31, 1991).

#### 1. UTC Corporate Defendants [5]

■ Plaintiff Dooley makes a sufficient showing as to the UTC Corporate Defen-

---

**5.** In their Reply Brief In Support Of Motion To Dismiss UTC Corporate Defendants For Lack Of Personal Jurisdiction Or, In The Alternative, For Transfer Of Venue To The District Of Columbia ("UTC Corporate Defendants' Reply"), the UTC

Corporate Defendants make what amounts to a separate motion to dismiss defendants Sikorsky, UT Holding Co. and SASAL on ground that they were wrongly named in the Complaint. UTC Corporate Defendants' Reply at 15. UTC Corpo-

dants under the "transacting business" subsection of the District of Columbia long-arm statute to establish a *prima facie* case of personal jurisdiction as to these defendants. The plaintiff's 159–page complaint sets forth numerous instances of UTC Corporate Defendants transacting business in Washington, D.C., during the period the conspiracy is alleged to have occurred. UTC Corporate Defendants own and maintain business and residential property in Washington, D.C. Through their offices in the District, it is alleged that representatives of UTC Corporate Defendants conducted business directly relating to the development, negotiation and implementation of the Black Hawk sale to the Saudi Arabians. *See* Complaint ¶¶ 23, 66, 131, 174. Plaintiff alleges that representatives of UTC Corporate Defendants made numerous trips to the District of Columbia throughout the course of the conspiracy to further its success. *See* Opposition Of Plaintiff Dooley To Motion By The UTC Corporate Defendants To Dismiss For Lack Of Personal Jurisdiction Or, In The Alternative, For Transfer Of Venue To The District Of Connecticut ("Opposition to UTC Corporate Defendants") at 15. Thus, the UTC Corporate Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).

Moreover, the plaintiff alleges that UTC Corporate Defendants sought out a Washington, D.C.-based corporation, Frank E. Basil, Inc., to become the conduit for the bribes passed to the Saudi Arabians. Complaint ¶¶ 188–189, 194–195, 197, 203–206, 209–210, 214. Basil, it is alleged, acted on

the direction of the UTC defendants. The UTC defendants allegedly profited from this association by using Basil's legitimate existence to shield their bribes to the Saudi officials from government scrutiny. The UTC Corporate Defendants' allegedly affirmative role in effecting this scheme is sufficient for asserting personal jurisdiction over them. *Avianca*, 1991 U.S. LEXIS 7447, at *6–*7.

■ Plaintiff also alleges that UTC Defendants have made countless phone calls and mailings into the District which directly relate to the Black Hawk Saudi sale. Opposition to UTC Corporate Defendants at 41–42. Courts, including this one, have found that telephone calls and mailings to Washington, D.C. constitute "transacting business" under section 13–423(a)(1). *Margoles v. Johns*, 483 F.2d 1212, 1218 (D.C.Cir.1973); *Dorothy K. Winston & Co. v. Town Heights Dev., Inc.*, 376 F.Supp. 1214, 1216 (D.D.C.1974); *See also Federal Deposit Insurance Corp. v. O'Donnell*, 136 B.R. 585 (D.D.C.1991).

Plaintiff Dooley's complaint certainly can be said to arise from the UTC Corporate Defendants' activities in the District of Columbia. It is through UTC Defendants' contacts with Saudi Arabian Ambassador Bandar in Washington, D.C. that the conspiracy allegedly came to its inception. Through UTC Defendants' visits to the District, the conspiracy allegedly came to fruition. And it is the defendants' connections to Frank E. Basil, Inc., in Washington, D.C., which established allegedly the mechanism for the bribes at the heart of the conspiracy. Plaintiff Dooley's alleged refusal to cooperate with this Washington-

rate Defendant argue that (1) Sikorsky is an unincorporated division of UTC with no independent juridical existence; (2) SASAL never existed; and (3) the Complaint misidentifies UT Holding Co. as the UTC subsidiary which retains UTC's ownership interest in defendant Westland Group PLC. *Id.*

Without further factual development of these claims, the Court cannot determine whether these defendants are included properly in the plaintiff's suit. Therefore, the Court shall reserve the question of whether Sikorsky, UT Holding Co. and SASAL are improper defen-

dants until the parties complete further discovery.

However, for the purpose of deciding the UTC Corporate Defendants' motion to dismiss on the question of personal jurisdiction, the Court assumes the existence of defendants Sikorsky, UT Holding Co. and SASAL. The Court finds that these defendants' acts, either direct or indirect, in the forum, are sufficient to establish personal jurisdiction. *See, infra* I(B)(4)(b), Court's discussion of conspiracy theory of personal jurisdiction.

centered conspiracy gave rise to his demotion and thus, this action.

Finally, the exercise of personal jurisdiction over the UTC Corporate Defendants satisfies due process requirements. The minimum contacts test described by the Court in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), focuses on the reasonableness of pursuing the litigation in the forum. *World–Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). "Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute." *Id.* The exercise of jurisdiction over a particular defendant must not offend "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158.

Considering the UTC Corporate Defendants' contacts to Washington, D.C., the Court concludes that the exercise of personal jurisdiction over these defendants does not offend due process. It is reasonable to require the UTC Corporate Defendants to return to the jurisdiction where they allegedly first sought to accomplish their scheme. The UTC Corporate Defendants should have foreseen that their actions in the District of Columbia, allegedly developing an illegal international conspiracy, would imperil persons like Dooley who refused to cooperate in the scheme. They also could have anticipated that an employee injured by his refusal to cooperate would seek redress in Washington, D.C., a hub of the conspiracy.

Moreover, the District of Columbia has a significant interest in providing a forum for the plaintiff's action. Plaintiff Dooley alleges what amounts to a large-scale fraud on the federal government. In particular, Dooley claims that the defendants' actions defrauded Congress, the State De-partment and the Department of Defense and manipulated the FMS program by which the government deals with foreign governments in military sales. The allegations, if proven, could have a substantial impact on future FMS sales. Additionally, Dooley contends that to accomplish this fraud, the UTC defendants sought out a Washington-based corporation, allegedly involving it in an illegal international conspiracy. This conspiracy purportedly embraced officials at the Saudi Embassy located in the District.

While Connecticut may be a more convenient forum for the defendants, the Court finds that to require the defendants to proceed in Washington, D.C. poses no undue burden, particularly in light of the significant interests the District retains in this litigation.

### 2. UTC Individual Defendants

■ The Court finds that plaintiff Dooley also has set forth sufficient contacts by the UTC individual defendants to satisfy the requirements for personal jurisdiction under section 13–423(a)(1). He has alleged numerous acts within the District carried out by the UTC individual defendants in furtherance of the conspiracy. For example, it is undisputed that Defendant Paul, who currently directs UTC's branch office in Washington, D.C., has traveled regularly to D.C. since 1990 in furtherance of the Black Hawk program. Paul Declaration ¶ 5 [6]. Paul also maintains an apartment in Washington, D.C. for business. *Id.* at ¶ 2. Although Paul denies that his activities in UTC's Washington office are related to any illegal conspiracy, his denial is not a statement of fact considered by the Court. UTC Individual Defendants' Reply, Exhibit 1 (Paul Supplemental Declaration), ¶ 3. Such "facts" are for the trier of fact at trial, not a court determining the sufficiency of a motion to dismiss for want of jurisdiction.

Defendant Homza admits he has traveled to Washington, D.C. nine times for business directly relating to the Black Hawk–

**6.** Declarations of the UTC Individual Defendants are attached as Exhibits to UTC Corporate

Defendants Motion To Dismiss.

Saudi sale. Homza Declaration ¶ 3. Six of the nine trips involved briefings of Department of Defense officials and/or State Department briefings. *Id.* However, at least some, if not all of these six visits involved other Black Hawk related business. *See id.* at ¶ 3(b)–(c). On three trips defendant Homza met with defendant Basil in reference to the FMS and MSS contracts. *Id.* On three trips defendant Homza visited the British Embassy to discuss Black Hawk business. *Id.* Plaintiff Dooley also alleges that Homza placed numerous calls into the District of Columbia. Complaint ¶ 37.

Defendant Zincone admits to traveling to Washington, D.C. on nine occasions for Black Hawk business. Zincone Declaration ¶¶ 3–4. Several of the visits involved briefings of either Department of Defense officials or State Department representatives or members of Congress; however, most of these visits also involved other Black Hawk business. *Id.* On one occasion, defendant Zincone met with Ambassador Bandar at the Saudi Chancery to discuss the Black Hawk sale. *Id.* Dooley alleges that Zincone also placed several calls and mailed at least one document into the District of Columbia. Complaint ¶ 45.

Defendant Peterson has made eight trips to Washington, D.C. in connection with the Black Hawk–Saudi sale. Peterson Declaration ¶ 16. During six of the eight trips, defendant Peterson briefed Department of Defense officials and/or State Department officials, but most of these trips also involved visits to UTC's Washington, D.C. office. *Id.* During two visits, defendant Peterson met with defendant Basil. *Id.* And in June 1989, defendant Peterson met with Ambassador Bandar, to discuss Sikorsky's start-up performance on Black Hawk construction. *Id.* On one other occasion, defendant Peterson visited the British Chancery to discuss the Black Hawk program. *Id.* at 17. According to the plaintiff, Peterson also has placed numerous calls into the District of Columbia. Complaint ¶ 40.

Defendant Buckley admits to seven visits to Washington, D.C., for Black Hawk business and one "courtesy call" to Ambassador Bandar[7]. Buckley Declaration ¶¶ 3–4. On six of the seven visits, defendant Buckley met with either Congressional representatives or U.S. Army officials to discuss some aspect of the Black Hawk program. *Id.* at 4. Dooley claims that Buckley also has placed several calls into the District of Columbia in reference to the Black Hawk program. Complaint ¶ 35.

Defendant Daniell has traveled to Washington, D.C. on at least three occasions for Black Hawk business. Daniell Declaration ¶ 3. On two occasions, defendant Daniell visited Ambassador Bandar to discuss business related to the Black Hawk sale. *Id.* at ¶¶ 4–5. One visit involved a "social call" to the Saudi Arabian embassy. *Id.* at ¶ 6. On one other occasion, defendant Daniell visited Washington, D.C. to meet with then Vice President George Bush on business tangentially related to sales of military hardware to the Saudis. *Id.* at ¶ 7. Dooley alleges that he prepared a position paper on the Black Hawk program for this meeting at the request of Daniell. Opposition to UTC Individual Defendants at 14. Dooley further alleges that Daniell placed several calls into the District in furtherance of the conspiracy. Complaint ¶ 36.

The Court finds that the above catalog of contacts by UTC Individual Defendants to Washington, D.C., in furtherance of the alleged conspiracy, is sufficient to sustain a finding of minimum contacts as to each UTC Individual defendant. The defendants purposefully entered the District to avail themselves and their employer of business opportunities that stemmed from their contacts here. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183. Through their contacts

---

7. Several of the UTC Individual Defendants state that they have paid "courtesy calls" to Ambassador Bandar. Plaintiff Dooley alleges that these so-called "courtesy calls" or social visits constitute business contacts because that is how the Saudis do business. Opposition to UTC Individual Defendants at 13.

The Court has construed this disputed issue in favor of the plaintiff and regards such "courtesy calls" as business contacts. *See Avianca,* 1991 U.S. Dist. LEXIS 7447, at *1.

with Washington, D.C., the UTC Individual Defendants created a substantial connection to Washington, D.C. to support the alleged conspiracy. *Id.*[8]

Moreover, Plaintiff Dooley also alleges many actions taken by UTC Individual Defendants outside the district to associate themselves and their employer with Washington, D.C.-based Basil. *See, e.g.,* Complaint ¶¶ 188, 189, 203, 204, 209, 210. These actions, as well as those alleged to have occurred in the District, were integral to the conspiracy which ultimately caused the plaintiff's demotion. Where a defendant "has created 'continuing obligations' between himself and residents of the forum", the Supreme Court has held that "[j]urisdiction may not be avoided merely because the defendant did not *physically* enter the forum state." *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (citation omitted) (emphasis in original).

The UTC Individual Defendants claim that most of their contacts with Washington, D.C. fall under the government contacts exception to personal jurisdiction. The government contact exception precludes the assertion of personal jurisdiction over a non-resident whose only contact with the District of Columbia is with Congress or a federal agency. *Chase v. Pan-Pacific Broadcasting, Inc.,* 617 F.Supp. 1414, 1425 (D.D.C.1985).

But the visits which the defendants point to, did not involve simply meetings with government officials. In most instances, the defendants visited, and presumably conducted business out of UTC's Washington branch office. *See, e.g.,* Zincone Declaration ¶ 3(a); Homza Declaration ¶ 3(c); Peterson Declaration ¶ 16(b). Although the defendants state that they did not conduct "meetings" in the Washington office, the Court must presume these visits involved business—writing memos, making phone calls, having discussions about the Black Hawk program—not mere social calls. *Id.* Thus, even disregarding the contact which arguably may be excepted under the government contacts doctrine, the Court finds sufficient contacts by the UTC Individual Defendants to the District to establish personal jurisdiction.

In addition, many of the individual defendants' contacts with the District do not fall under the government contacts exception because they involve meetings either with Ambassador Bandar, defendant Basil, or with the British Embassy or Chancery.[9]

The UTC Individual Defendants also argue that several of the defendants' visits to Washington, D.C. took place after Dooley's demotion in October 1988, and therefore, cannot give rise to the plaintiff's complaint. This argument is unavailing. Plaintiff Dooley alleges that the harm he has suffered only initiated with his demotion. He claims that the illegal conspiracy to bribe Saudi Arabian officials continues; consequently, the harm he suffers, from opposing the ongoing conspiracy, continues. Thus, business trips to Washington, D.C. taken by UTC Individual Defendants after

**8.** The Supreme Court has stated that even a single act within the district can support jurisdiction when it creates a substantial connection with the forum. *Burger King,* 471 U.S. at 475, n. 18, 105 S.Ct. at 2184, n. 18; *See also Avianca,* 1991 U.S. Dist. LEXIS 7447, text accompanying note 9.

**9.** Defendants argue that the government contacts exception should be extended to cover meetings with embassies or foreign dignitaries in Washington. Defendants contend that the logic of the government contacts doctrine extends to such contacts because the embassies are located in Washington, D.C. and members of the public have no choice but to come here for their services. Motion To Dismiss UTC Corporate Defendants For Lack Of Personal Juris-

diction Or To Transfer To The District of Connecticut ("UTC Corporate Motion") at 23–24.

No Court has extended the governments contracts exception to jurisdictional contacts analysis in the way defendants suggest. *See, infra,* n. 11. This Court refuses to do so now.

The Court also notes that even if some contacts with embassies fall under the government contacts exception, the Court would be hesitant to apply the doctrine here where the defendants' contacts were in pursuit of a proprietary interest. *See Mutual Int'l Export Co. v. Napco Indus., Inc.,* 316 F.2d 393, 397 (D.C.Cir.1963) (foreign corporation in the business of trading with various foreign governments through a Washington, D.C. representative was "doing business" for purposes of federal venue and jurisdiction statute.)

October 1988 are very relevant to plaintiff Dooley's claims.

The UTC Individual Defendants further argue that even if they had significant contacts with the district during the years that the Black Hawk program developed, these contacts did not give rise to the plaintiff's claims. The Court also rejects this argument. The plaintiff has alleged an ongoing conspiracy. The roots of the conspiracy, as alleged, are the negotiation and sale of Black Hawk helicopters to Saudi Arabia along with maintenance and support services using bribes and other unfair practices. In order to accomplish their ends, the defendants established and maintained contacts in this district. Plaintiff Dooley's claims arise from these contacts because without them the conspiracy would not have been possible and plaintiff Dooley would not have been harmed.

### 3. Smith Defendants

 Defendants Olin E. Smith and Olin E. Smith & Associates also contest the assertion of personal jurisdiction under the District's long-arm statute over them[10]. But, as the plaintiff points out, the Smith defendants have the slimmest rod on which to stand. Defendant Olin Smith admits to 12 meetings in Washington, D.C. with the Saudi Ambassador, Prince Bandar and "an unspecified number" of mailings to the Ambassador. Memorandum Of Points And Authorities In Support Of The Smith Defendants' Motion To Dismiss Or, Alternatively, For Transfer To Connecticut ("Smith Defendants' Motion") at 5. *See also* Reply Memorandum In Support Of The Smith Defendants' Motion To Dismiss Or, Alternatively, For Transfer To Connecticut ("Smith Defendants' Reply") at 2. Thus, Smith defendants' admitted contacts with the forum are more substantial than any of the UTC Individual Defendants. On sheer number of contacts alone, this Court concludes that the "minimum contacts" requirement is satisfied as to the Smith defendants.

Moreover, the plaintiff sets forth a continuing association between General Smith and Ambassador Bandar which is integral to the success of the alleged conspiracy. In essence, plaintiff Dooley charges that General Smith was the eyes and ears of defendant UTC/Sikorsky in dealing with Ambassador Bandar. *See, e.g.,* Complaint ¶¶ 41, 134, 142, 155, 164. The plaintiff's claims stem, in large part, from the association between Prince Bandar and General Smith. This relationship is one of the centerpieces of the alleged conspiracy. Without it, Dooley claims, the conspiracy which ultimately caused his demotion might never have existed. The Court finds these allegations sufficient to establish the plaintiff's *prima facie* case as to the Smith Defendants.

The Smith Defendants' central argument against the assertion of personal jurisdiction is that any contacts between Olin Smith and Ambassador Bandar cannot be considered under the government contacts exception. They argue that the Court of Appeals, in *Fandel v. Arabian Am. Oil Co.,* 345 F.2d 87 (D.C.Cir.1965), concluded that a defendant's contact with a foreign embassy qualify as government contacts. Smith Defendants' Motion at 6.

However, the Court's opinion in *Fandel* does not support this conclusion. In *Fandel,* the Court held that a foreign corporation's activity in Washington, D.C., which included advising the State Department, other executive agencies of the United States, educational and international organizations, as well as diplomatic missions, on the Middle East, did not constitute "doing business" in the District of Columbia. *Fandel,* 345 F.2d at 88–89. The Court focused on the fact that the defendant's contacts with the District were of a diplomatic rather than business nature. *Id.* at 89.

Thus, the Court did not single out, as the defendants suggest, contacts with foreign embassies as outside the jurisdictional analysis. On the contrary, the Court specifically distinguished the facts from those in *Napco,* noting that the defendant's situation "[was] not quite like the company whose agents in Washington are seeking contracts, either with our own Government

---

**10.** The Court agrees with plaintiff Dooley's assessment that defendant Olin E. Smith & Associ-

ates has conceded that contacts by its principal, defendant Olin E. Smith, are binding on it.

or with other governments represented in Washington." *Id.* [citation omitted] [11]

### 4. Defendant Westland, Inc.

#### a. *Direct Contacts With The Forum*

Westland, Inc. is a Delaware corporation with its office in Arlington, Virginia. Plaintiff Dooley asserts that long-arm jurisdiction under § 13–423(a)(1) extends to Westland, Inc.'s contacts with this forum. In the plaintiff's Opposition to Westland, Inc.'s motion to dismiss, Dooley asserts three types of contacts by Westland, Inc. with the District during the relevant period: first, lobbying Prince Bandar at the Saudi Embassy; second, lobbying Congress on an amendment ("Amendment 4") to the licensing agreement between UTC and Westland; and third, collaboration with UTC employee, Mike Hull, in UTC's Washington, D.C. office on the amendment. *See* Opposition Of Plaintiff Thomas F. Dooley To Defendant Westland, Inc.'s Motion To Dismiss ("Opposition to Westland, Inc.") at 7.

 None of these contacts, on its own, is sufficient to satisfy personal jurisdiction under the District's long-arm statute. First, defendant Westland, Inc. flatly denies the allegation that it lobbied Prince Bandar at the Saudi Embassy. *See* Westland, Inc.'s Reply To Plaintiff's Opposition To Westland, Inc.'s Motion To Dismiss The Complaint ("Westland, Inc.'s Reply") at 6; Exhibit 1, Declaration of Robert J. Gladwell; Exhibit 2, Declaration of Jeffrey R. Fausett. Without further supporting details, the plaintiff's broad-based assertion is insufficient to overcome defendant Westland, Inc.'s denial of any contact with Prince Bandar. *See Data Disc, Inc. v. System Tech. Assoc., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977) ("... we may not assume the truth of allegations in a pleading which are contradicted by affidavit.") (citation omitted).

 Defendant Westland, Inc. also denies, that its employees lobbied Congress on the Black Hawk sale to Saudi Arabia. Westland, Inc.'s Reply at 6. But, Westland, Inc. does not deny that it may have lobbied Congress to obtain and amend its licensing agreement with UTC. Westland, Inc.'s Reply at 8. Nonetheless, these contacts cannot form the basis for the exercise of personal jurisdiction in this forum because they are exempted under the government contacts doctrine.

Plaintiff suggests that the government contacts doctrine has been limited to nonproprietary contacts, and that Westland, Inc.'s contacts in pursuing Amendment 4 were proprietary. Opposition to UTC Corporate Defendants at 44. But even the plaintiff admits that seeking the government's aid for business, is an exercise of commercial free speech and, therefore, qualifies for the government contacts exception. *Id.*

Whatever the limits of the government contacts doctrine, the Court finds that Westland, Inc.'s alleged lobbying activity before the Congress falls safely within them. Westland, Inc.'s purported efforts to encourage Congress to approve the licensing agreement and subsequent amendment were activities implicating first amendment rights. *See Rose v. Silver,* 394 A.2d 1368, 1373–74 (D.C.App.1978). The fact that Westland, Inc. may have lobbied Congress to promote a proprietary interest does not remove their actions from the realm of first amendment activity. *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 768–87 (D.C.Cir.1983), *cert. denied* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984).

 The third type of contact alleged by plaintiff Dooley—contact between UTC's Mike Hull and Westland, Inc. in UTC's Washington, D.C. office to coordinate on Amendment 4 to the UTC–Westland licensing agreement—does not provide a basis for the exercise of personal jurisdiction under section 13–423(a)(1) as pled. Nowhere in the complaint does Dooley state with any specificity, the nature of the contact between any Westland defendant and Mike Hull or UTC's Washington, D.C. office. In fact, Dooley fails to allege that Westland, Inc., the only Westland defen-

---

11. *See supra,* n. 9.

dant presently before the Court, had any direct contact whatsoever with the UTC defendants in Washington, D.C. The sole allegation in the complaint that goes to a Westland defendant's direct contacts with UTC in the District is found in paragraph 299 of the Complaint. That paragraph reads:

> (299) Upon information and belief, David Gardner, Marketing Director for Westland Helicopters, coordinated with Hull Westland's efforts to secure *Amendment 4.*

Defendant Westland, Inc. in its papers states that Westland Helicopters, Ltd. is an English corporation, separate and distinct from Westland, Inc. Westland Inc.'s Reply at 3. Moreover, Westland, Inc., through affidavits of its employees, attests that David Gardner, an employee of Westland Helicopters, Ltd., has never been employed by Westland, Inc. Westland Inc.'s Reply at 4, n. 2.

Alleged contacts by Westland Helicopter, Ltd. employees are insufficient to subject Westland, Inc. to personal jurisdiction in this Court. The plaintiff must establish personal jurisdiction as to each defendant separately.

### b. *Conspiracy Theory of Personal Jurisdiction*

 Plaintiff Dooley argues that in examining defendant Westland, Inc.'s contacts with the forum for purposes of personal jurisdiction, the Court must look not only at the defendant's direct contacts with the forum, but also at Westland, Inc.'s contacts in Washington, D.C. through its co-conspirators. Plaintiff Dooley argues that the conspiracy theory of jurisdiction subjects Westland, Inc. to personal jurisdiction in the District of Columbia. Opposition to Westland, Inc. at 9.

In *Mandelkorn v. Patrick*, 359 F.Supp. 692 (D.D.C.1973), the Court held that acts within the forum of one co-conspirator, in furtherance of an alleged conspiracy, subject a nonresident co-conspirator to personal jurisdiction. *Mandelkorn* involved a District of Columbia resident who claimed that resident and nonresident defendants conspired to deprive him, and other class

members, of free speech, religion, association and travel rights. Although several of the defendants had no direct contacts with Washington, D.C., the Court found that the agency relationship between the co-conspirators was sufficient to extend the Court's long-arm jurisdiction to nonresident defendants where resident defendants committed overt acts within the District. *Id.* at 695–97. The Court stated, "[a]ssuming as true the unchallenged allegations of conspiracy and an overt act in the District of Columbia in furtherance of the conspiracy, this Court sees no injustice in requiring New York and Florida Defendants to submit to suit here." *Id.* at 696.

Courts in this Circuit after *Mandelkorn*, have applied the conspiracy theory of jurisdiction warily. In seeking to prevent a broad extension of long-arm jurisdiction by the mere allegation of conspiracy, these courts have required particularized pleading of the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy. *See Naartex*, 722 F.2d at 787; *First Chicago Int'l v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1378–79 (D.C.Cir.1988). Also, these courts have found mere speculation that the nonresident defendants' are co-conspirators insufficient to meet plaintiff's *prima facie* burden. *Hasenfus v. Corporate Air Services*, 700 F.Supp. 58, 62 (D.D.C.1988).

In this case, however, plaintiff Dooley has set forth, in extraordinary detail, his allegations of conspiracy and each defendant's alleged involvement. He has cataloged numerous meetings allegedly held by the co-conspirators, and in many instances, described discussions which took place. Additionally, he has set forth a number of overt acts within the District of Columbia allegedly committed by co-conspirators. For example, the formation of a joint venture between defendant Basil and Thimar and illegal payments laundered through Washington, D.C.-based Basil.

In alleging that Westland, Inc. facilitated the actions of its parent corporation, Westland Group PLC, to arm Black Hawk helicopters sold to the Saudi government, Dooley has connected defendant Westland, Inc.

to the alleged conspiracy. Complaint, ¶ 32. Specifically, Dooley alleges that Westland, Inc. played a role in the filing of the licensing application and Amendment 4 which allowed the Black Hawks to be armed without approval from the United States Government. Dooley further alleges that the defendants knew that the application and amendment contained misstatements and omissions [12]. Opposition to Westland, Inc. at 8; *see also* Complaint ¶¶ 263, 267, 383.

While acknowledging that courts in this circuit have accepted the conspiracy theory of jurisdiction, defendant Westland, Inc. insists that these courts have required a resulting injury in the forum as well as an overt act by a co-conspirator. Westland, Inc. Motion at 20. Westland argues that "[u]nder no conceivable circumstances can Dooley allege that he was injured [in the District of Columbia]." *Id.*

Defendant's argument fails to grasp the relationship between the conspiracy theory of jurisdiction and the underlying long-arm statute upon which personal jurisdiction is grounded. The conspiracy theory of jurisdiction does not by itself provide a basis upon which the exercise of personal jurisdiction may rest. Rather, the conspiracy theory is an extension of the jurisdiction conferred upon a court by the enactment of a long-arm statute. *See Mandelkorn*, 359 F.Supp. at 694 ("The question of the validity of 'long-arm' service to reach participants in an allegedly wide-ranging conspiracy has received surprisingly little judicial attention."). Jurisdiction under the theory is based on the agency relationship between the co-conspirators. *Id.* The actions of co-conspirators, acting as an agent, within the forum is attributed to co-conspirators outside the forum. *Id.*

Courts in this circuit which have required an injury within the forum to establish co-conspirator liability, have considered the theory only in relation to section 13–423(a)(3) of the District of Columbia long-arm statute. *Edmond v. U.S. Postal Service General Counsel*, 949 F.2d 415, 424–26 (D.C.Cir.1991); *Dorman v. Thornburgh*, 740 F.Supp. 875, 878 (D.D.C.1990), *app. disms. in part, aff'd, in part*, 955 F.2d 57 (D.D.C.1992)[13]. *See also McManus v. Washington Gas Light Co.*, 1991 WL 222345, 1991 U.S. Dist. LEXIS 14539, *4–*8 (D.D.C. Oct. 15, 1991); *Hasenfus*, 700 F.Supp. at 61–62.[14] Section 13–423(a)(3) imposes, by its own terms, the requirement of injury within the forum.

12. Plaintiff's Complaint does not state specifically the nature of Westland, Inc.'s role in preparing and filing the original licensing agreement and Amendment 4. However, defendant Westland, Inc. does not deny the allegation that it was involved in the licensing and amendment process. Rather, Westland, Inc. argues that "[a]ny Westland, Inc. telephone calls or visits to OMC took place in Virginia, not the District of Columbia." Westland, Inc's Reply at 6. Thus, the Court has treated the specific allegations of Westland, Inc.'s involvement in the licensing and amendment process as conceded.

13. In *Edmond*, subsection (a)(3) was the only ground asserted for personal jurisdiction under the long-arm statute. Therefore, the Court of Appeals addressed the relationship between the conspiracy theory and subsection (a)(3) only. *See Edmond*, 949 F.2d at 427, n. 1 (Silberman, J., concurring in part and dissenting in part) ("We have not yet been told by the District of Columbia Court of Appeals-whose interpretations of the D.C. long-arm statute are of course binding-whether § 13–423(a)(3) encompasses the conspiracy theory ...").

The Court in *Dorman*, considered subsections (a)(1), (a)(3) and (a)(4) of the D.C. long-arm statute as possible bases for personal jurisdiction. *Dorman*, 740 F.Supp. at 877. The Court did not state specifically which subsection of the D.C. long-arm statute it was analyzing in relation to the conspiracy allegation. However, the Court, quoted *Mandelkorn*: "Under the *District of Columbia 'long-arm' statute*, both the act and the effect, or injury, must take place in the District. *Mandelkorn v. Patrick*, 359 F.Supp. at 695", *Dorman*, 740 F.Supp. at 878 (emphasis added). Thus, both *Dorman* and *Mandelkorn* recognize that the requirement of injury within the forum stems from the particular subsection of the D.C. long-arm statute, not from a separate prong of the conspiracy theory of jurisdiction.

14. In both *McManus* and *Hasenfus*, the Courts examined section 13–423(a)(1) and section 13–423(a)(3) as alternative basis for personal jurisdiction. Neither court specifically stated to which subsection of the long-arm statute its conspiracy theory analysis applied. However, there is no indication that in either case the court was asked to consider whether the conspiracy theory imposed a separate requirement of injury within the forum.

Thus, the requirement of injury within the forum stems from the underlying long-arm provision, not from the independent application of the conspiracy theory. *Mandelkorn,* 359 F.Supp. at 695.

In contrast, section 13–423(a)(1) poses no such requirement of injury within the forum. Courts which have considered the conspiracy theory in conjunction with section 13–423(a)(1) have not imposed this requirement. In *First Chicago,* 836 F.2d at 1378–79, the court rejected application of the conspiracy theory under section 13–423(a)(1) because plaintiff failed to make a *prima facie* showing that nonresident defendant participated in a conspiracy in the District. In *Naartex,* 722 F.2d at 787 & n. 7, the court viewed skeptically the plaintiff's allegation that fraudulent acts occurred in D.C. and held that bald speculation as to a conspiracy was insufficient to establish jurisdiction. Notably, neither court mentioned injury within the forum as a separate requirement for establishing conspiracy theory of jurisdiction.

Because personal jurisdiction over Westland, Inc. stems from section 13–423(a)(1), not section 13–423(a)(3), plaintiff Dooley need not allege an injury occurring within the District of Columbia in asserting the conspiracy theory of jurisdiction. Therefore, the Court finds that Dooley has made a *prima facie* showing of personal jurisdiction as to defendant Westland, Inc. under the conspiracy doctrine. The plaintiff has set forth, with sufficient specificity, allegations of defendant Westland, Inc.'s involvement in a conspiracy and alleged overt acts by co-conspirators committed in Washington, D.C. in furtherance of the conspiracy.

## II. VENUE

UTC Individual defendants, defendant Olin Smith also have moved to dismiss on the ground that the District of Columbia is an improper forum. But the defendants' arguments challenging venue are unpersuasive. The Court finds that the venue provisions of Title 28, United States Code, section 1391(b)(2) for an action founded on federal question jurisdiction apply. The Court further finds that venue is proper even as to plaintiff Dooley's state law claims under the doctrine of pendent venue.

### A. Federal Question Venue

■ Plaintiff Dooley invokes the general federal question venue statute, Title 28, United States Code, section 1391(b) as a basis for his claim that venue is proper in the District of Columbia.[15] Subsection (b)(2) of the statute provides that actions founded on federal question jurisdiction may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." The statute was amended in 1990 substituting the current language for the formulation which made venue proper in the "[district] in which the claim arose." The drafters of the new section stated that new language was directed in part at the problem created by "the frequent cases in which substantial parts of the underlying events have occurred in several districts." H.R.Rep. No. 734, 101st Cong., 2nd Sess. (1990), 1990 WL 200439, P. 65 (Leg.Hist). In such cases, it appears that the new language is intended to place venue within the District of Columbia, even where the case also might be brought in another forum.

Certainly plaintiff Dooley's allegations present such a case. It is true, as the defendants argue, that a number of the events alleged in the plaintiff's complaint occurred in or were centered around the District of Connecticut. But it is equally true that a substantial part of the conspiracy, which forms the gravamen of Dooley's complaint, was centered in Washington, D.C.

Washington, D.C. is home to the Saudi Arabian Embassy and Ambassador Bandar. According to the complaint, Prince Bandar designated Namlah as Sikorsky's "business contact" in Saudi Arabia. Complaint at

---

**15.** In addition to subsection (b)(2), Plaintiff Dooley argues venue is proper under subsection (b)(3) of the statute. The plaintiff also asserts venue under RICO section 1965(a) and (b). Because the Court finds venue is proper under 28 U.S.C. § 1391(a)(2), it does not consider the alternative grounds for venue advanced by the plaintiff.

¶¶ 136, 138. This designation, it is alleged, set the bribery scheme in motion. During the months following Namlah's designation, Dooley alleges that several of the defendants traveled to Washington, D.C., to arrange the details of the bribery scheme at the heart of the conspiracy. According to the plaintiff, defendant Smith had continual contact with Prince Bandar on all aspects of the Black Hawk–Saudi sale during this period. Dooley also asserts that after contemplating various mechanisms to funnel the bribes to Namlah, Khalid and Fahad, UTC defendants chose defendant Basil in Washington to play a key role. More meetings in Washington, D.C. between the various defendants facilitated the eventual joint venture between Thimar and Basil. Finally, plaintiff Dooley points out that the FMS, MSS and PSS contracts were processed and approved in the District of Columbia.[16]

Thus, the Court finds that Washington, D.C. is a hub of the alleged conspiracy, and a substantial part of the events which form the basis for Dooley's complaint occurred here. Consequently, venue in the District of Columbia is proper.

### B. Pendent Venue

■ The Court also finds that venue is proper as to the plaintiff's non-RICO claims under the Court's pendent venue authority. All of the plaintiff's claims arise "out of a common nucleus of operative fact." *Beattie v. United States*, 756 F.2d 91, 102 (D.C.Cir.1984). Dooley's claims of retaliatory discharge, tortious interference with contract, fraud, negligent and/or innocent misrepresentation, intentional and unintentional infliction of emotional distress, defamation, invasion of privacy and civil conspiracy arise from the same set of factual assertions which the plaintiff sets forth to support his federal RICO and conspiracy to obstruct justice claims. Both the federal and state law claims will require proof of the essence of the conspiracy and the defendants' efforts to prevent Dooley from "blowing the whistle" on their illegal acts.

Count IV through Count IX—retaliatory discharge, tortious interference with contract, fraud and misrepresentation—require proof of the plaintiff's employment relationship with defendant Sikorsky. Proof that Dooley's opposition to the defendants' alleged illegal conspiracy caused his demotion is crucial in establishing these claims. These facts are also central to plaintiff Dooley's RICO claim.

The remaining counts—infliction of emotional distress, defamation, invasion of privacy and civil conspiracy—focus on the UTC defendants' actions after Dooley was demoted. Proof of these facts certainly will be presented to support the RICO and obstructing justice counts. The plaintiff contends that he was demoted for opposing the illegal bribery scheme. The plaintiff further contends that the defendants' post hoc rationalizations for their retaliatory acts are an attempt to conceal the existence of an illegal international conspiracy. Thus, the defendants' actions after plaintiff Dooley's demotion will be highly relevant to proving the existence of the conspiracy under RICO.

Given the common basis in fact for each of the counts in the plaintiff's complaint, the Court finds venue also is proper as to the state law counts. Consequently, the Court concludes that under Title 28, United States Code, section 1391(b) and the pendent venue doctrine, venue is proper as to the entire complaint.

### III. MOTION TO TRANSFER

Title 28, United States Code, Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a court may transfer any civil action to any other

---

**16.** The UTC Individual Defendants make much of the "fact" that the FMS contracts were negotiated in St. Louis not in Washington, D.C. However, this "fact" does not negate the plaintiff's allegation that the FMS contract was presented and approved ultimately in Washington. Nor does it contravene Dooley's claim that the defendants' contacts with Prince Bandar in the District of Columbia, were instrumental in getting the FMS contract sole-sourced. It also does not address Dooley's allegation regarding the MSS and PSS contracts which allegedly central to the defendants' bribery scheme.

district or division where it might have been brought.

■ The language of the section indicates that transfer under section 1404(a) is a discretionary matter for the Court. In considering transfer, a court must weigh the factors set forth by section 1404(a)— convenience of the parties and witnesses and the interest of justice—against the longstanding principle that the plaintiff's choice of forum rarely should be disturbed. *Pain v. United Technologies Corp.*, 637 F.2d 775 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *accord National Bank of Washington v. Mallery*, 669 F.Supp. 22, 29 (D.D.C.1987).

In this case, the Court recognizes that Connecticut may be a more convenient forum for some of the parties and a number of the witnesses. However, the Court finds that the interests of justice do not support transferring this case to Connecticut. As the Court has indicated previously, Congress has directed courts to place great emphasis on the expeditious treatment of all civil matters. This Court has familiarized itself with the details of this matter. The Court also has kept on its calendar sufficient time for trial, in the event trial is necessary, to proceed with this matter expeditiously. Transfer, now, would result in delay which would fly in the face of the congressional directive.

Compounding this factor is the plaintiff's choice of forum in Washington, D.C.. The defendants point out that courts, including this one, have held that this factor is given less weight when the plaintiff is a foreigner in his chosen forum. *See Martin–Trigona v. Meister*, 668 F.Supp. 1, 2 (D.D.C. 1987). However, in this case, Washington, D.C., in addition to being the plaintiff's chosen forum, is the district where counsel for all of the parties are located. Consequently, much, if not most, of the work of pursuing this matter in court will be centered in the District of Columbia. The Court finds that it will not cause great hardship to the parties to finish that process by trying the case within the District.

## IV. CONCLUSION

For the aforestated reasons, this Court finds that personal jurisdiction and venue exist as to the UTC Corporate Defendants, UTC Individual Defendants, the Smith Defendants and defendant Westland, Inc. Furthermore, the Court denies motions by these defendants and defendant Frank E. Basil, Inc. to transfer this case to the District of Connecticut.